[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-15583

_____

D. C. Docket No. 06-01516-CV-BE-S

SHERIKA TOWNSEND,

Plaintiff-Appellee,

versus

JEFFERSON COUNTY, as persons under
42 U.S.C. 1983, et al.,

Defendants-Cross-
Defendants,

ARLENE CHAMBERS, individually and
in her capacity as a Jailer for
the Jefferson County Jail,

Defendant-Cross-
Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 11, 2009)

Before CARNES and PRYOR, Circuit Judges, and STAGG,[*] District Judge.

PRYOR, Circuit Judge:

This interlocutory appeal presents the question whether two deputies at a county jail were deliberately indifferent to the serious medical need of a pregnant detainee who had used crack cocaine daily. The undisputed evidence proves that both deputies knew that a nurse at the jail had seen and spoken with the detainee, and it is undisputed that the nurse determined that the detainee's medical need was not an emergency. Sherika Townsend suffered a miscarriage while detained in the Birmingham jail of Jefferson County, Alabama, and Townsend complained that Deputies Arlene Chambers and Brandy Daniels violated her civil rights under the Fourteenth Amendment by acting with deliberate indifference to her serious medical need. The deputies moved for summary judgment on the basis of qualified immunity, and the district court denied the motion. We reverse and render a judgment in favor of the deputies.

## I. BACKGROUND

Our discussion of the background of this appeal is divided in two parts. We first discuss the facts leading to Townsend's complaint against the deputies. We

---

[*] Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

then discuss Townsend's complaint and the deputies' motion for summary judgment.

## *A. Facts Leading to Townsend's Complaint*

This case arises from Townsend's confinement in the Birmingham jail on September 24, 2004. The parties offer conflicting accounts of the events in question, but we "set forth the facts, drawn from the evidence presented, in the light most favorable to [Townsend]." Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1265 (11th Cir. 2005). Townsend has adopted the facts described in the opinion of the district court, so we accept those findings as the version of the facts that favors Townsend.

In the early morning hours of September 24, 2004, Townsend was arrested for failure to appear on the charge of possession of a controlled substance. Townsend was pregnant and under the influence of crack cocaine. Townsend knew that she was pregnant and that using cocaine daily during her pregnancy could cause a miscarriage, but she both used crack cocaine and smoked cigarettes every day of her pregnancy.

Townsend was admitted at the Birmingham jail at 1:08 a.m. At about 4:50 a.m., Townsend met with a nurse who completed a health screening form. Townsend told the nurse that she was pregnant. Townsend testified that she told

the nurse that she was four or five months pregnant, but the receiving screening form states that Townsend was three months pregnant.

Between 6:00 a.m. and 7:00 a.m., Townsend was taken to Level 5 of the jail and placed in cell F-9 with two other inmates, April Nix and Catarina Mejia. Townsend initially testified that Deputies Chambers, Daniels, and Suzann Isaacs were working on Level 5 when she arrived, but Townsend later admitted that Deputies Issacs, Cathy Cargle, and Diane Preston were on duty on Level 5 at that time. Townsend admits that Daniels and Chambers reported for duty on Level 5 that day at about 2:00 p.m. and 3:15 p.m., respectively.

Townsend alleges that at about 10:00 a.m. she began to experience abdominal pain and vaginal bleeding. The parties dispute when Townsend first advised the deputies of her condition, as well as how often Townsend contacted the deputies. Townsend was not wearing a watch during her detention at the jail.

Townsend provides conflicting accounts of her contacts with the deputies. Townsend first testified that, when she began to experience pain and bleeding at about 10:00 a.m., she contacted "[Daniels] at first and then Ms. Chambers." Townsend testified that she used the intercom inside her cell to contact Daniels. Townsend testified that she told Daniels that she was pregnant and "spotting," and that Daniels responded that she would get the nurse as soon as possible. Townsend

4

testified that she used the intercom to contact Chambers within "[t]he next hour" after she first contacted Daniels. Townsend testified that she told Chambers "[t]he same thing" that she had told Daniels. Townsend testified that she was not given anything in response to her reports that she was spotting, that her cell already contained sanitary pads, and that she used the pads. Townsend testified that she used the intercom five more times to notify Daniels of her condition after her initial call at about 10:00 a.m. Townsend testified that she never went "to the pod" to talk to either Chambers or Daniels, but that she yelled from her cell to request help constantly from about 10:00 a.m. until that evening. Townsend testified that the deputies ignored her and that it took more than eight hours for her to get help.

Townsend later testified that she was lying on the floor outside her cell when she "experienced the first pain" and that she used the intercom outside her cell to contact both Chambers and Daniels. Townsend testified that she contacted the deputies by intercom a second time to notify them of her condition, but that she did not know how long after her first call she made the second call. Townsend also testified that she did not know with whom she spoke during the second call.

Townsend testified that her cellmates also used the intercom outside their cell to contact the deputies about her condition. Townsend testified that she heard her cellmates report that "[t]his pregnant lady is bleeding and hurting," but

5

Townsend did not state what time her cellmates made this call or with whom they spoke. Townsend was unable to hear the deputy's response. Nix stated that she and Mejia used the intercom to "t[ell] [Daniels] of the problem" at "about 6-6:30 pm," when Townsend "was complaining of pain [and] bleeding." Townsend estimated that she, Nix, and Mejia made ten more intercom calls after her cellmates contacted the deputies and before a nurse arrived.

An inmate in the cell next to Townsend's cell, Kiana Brown, stated that Nix and Mejia used the intercom at least eight times to contact the deputies. Brown stated that she also used the intercom to contact the deputies three times, but Brown did not state with whom she spoke or when she used the intercom. The first time Brown called, the deputy who answered stated "'they had it,'" but "no one came to check on Townsend." The second time she called, the deputy who answered "responded 'don't ring the damn buzzer again.'" The third time she called, no one responded "in any way."

Chambers began checking the F-Block of Level 5 at about 7:00 p.m. Chambers used a wand that electronically recorded her "progression through [the] cell block check" and "maintain[ed] a log of the cells and rooms inspected by [Chambers] and the time of the inspection of the cells and rooms." The report from the wand states that Chambers checked Townsend's cell at 7:18 p.m.

While Chambers was checking the F-Block, Townsend told Chambers that she was pregnant, spotting, and did not feel well. Townsend was not wearing a sanitary pad when Chambers spoke with her. Chambers told Townsend to use a pad so that the nurse could see it. Chambers denies hearing or receiving any intercom calls from Townsend during her shift.

Daniels testified that she first learned of Townsend's condition between 7:30 p.m. and 8:00 p.m. when Townsend's cellmates used the intercom to report that Townsend was bleeding, vomiting, and suffering abdominal pain. Daniels testified that she then spoke to Townsend and that Townsend confirmed her symptoms and that she was about four months pregnant. Daniels testified that she told Townsend that her condition could be normal, but "to be on the safe side" she needed to see the nurse, Sallie Langston, who was currently conducting a "pill pass" near Townsend's cell. Daniels testified that this conversation was the only time she spoke to Townsend on the intercom. Townsend testified that Langston did not arrive at her cell until three or four hours after she first notified Daniels of her condition at about 10:00 a.m., but the parties do not now dispute that Langston reported for duty at 3:00 p.m.

As the district court stated, "All parties agree that Townsend saw Nurse Langston for the first time after 7:30 p.m., when the nurse arrived at the slider door

7

of Level 5 to administer medication." Townsend testified that Langston "came up and . . . asked to see my pad and I showed it to her . . . at the door [to her cell unit]." Townsend testified that she showed Langston the first pad that she had used that day and that the pad "had spots on it." Langston testified that Townsend showed her a piece of tissue with a pink spot, not a pad, and that Townsend was calm and did not exhibit any outward signs of pain, such as grabbing her abdomen or bending over in pain.

Townsend testified that Nurse Langston told her that she was overreacting and needed to calm down. Langston testified that she recognized that Townsend needed further examination, but that because Townsend's condition was not an emergency, she told Townsend that she would return in about 90 minutes when she finished administering medication. Both Chambers and Daniels knew that Langston visited Townsend while she was conducting a "pill pass," and "heard Langston advise Townsend that she would see her after her 'pill pass' duties."

Townsend testified that "an hour or two" later, after she failed to "calm down," she was taken away from the other inmates and placed in a separate consultation room where she could talk to Nurse Langston. Townsend testified that Langston told her that there was not enough blood for her situation to be considered an emergency, but that Langston did not examine her or give her any

8

instructions. Townsend testified that she then returned to her cell. Chambers testified that after Townsend saw Langston, Townsend asked to go to the bathroom and then declined Chambers's offer of a sandwich and told Chambers that she was not feeling well and wanted to lie down. Chambers testified that Townsend did not appear to be in pain. Chambers spoke with Langston after Langston saw Townsend. Langston told Chambers that Langston did not think that Townsend's condition was an emergency, but that she would consult a doctor.

Townsend's condition deteriorated after she returned to her cell. Townsend testified that she contacted the deputies on the intercom "several" times after she returned to her cell, but Townsend testified that she does not know with whom she spoke. Townsend did not state what she told any deputy during these calls. Nix stated that she and Mejia also contacted the deputies when Townsend "got worse." Nix stated that "we hit buzzard again, at this point we are scared about keep hitting it." Nix stated that "[t]hey came on, we told them the problem, they told her it was 'fucking normal' [and] 'that she needed to learn the difference between spotting [and] bleeding heavy' [and] 'that the nurse would see her after pill call,' but she never did."

Between 9:30 p.m. and 10:00 p.m., after she finished administering medication, Langston went to Level 3 to ask another nurse if she would see

9

Townsend. That nurse agreed, and Langston testified that she then called the control room twice to request that Townsend be brought to the medical clinic on Level 3. Langston testified that the deputy with whom Langston spoke said that she was alone in the control room and no one was available to bring Townsend to the clinic. Langston testified that she spoke to Chambers, but Chambers denies receiving Langston's call, and Chambers left duty on Level 5 at about 9:30 p.m. Daniels also denies receiving a request to bring Townsend to the medical clinic.

Deputy Preston reported to duty on Level 5 at about 10:00 p.m. At 10:13 p.m., Townsend's cellmates called Preston and Daniels to report that Townsend was on the toilet with a "baby hanging out." Medical personnel responded and confirmed that Townsend was suffering a miscarriage. At 10:35 p.m., Townsend was taken by ambulance to a nearby hospital for treatment. No doctor at the hospital advised Townsend that any measures could have been taken that day to prevent the miscarriage.

*B. Townsend's Complaint and the Deputies' Motion for Summary Judgment*

Townsend filed a complaint against Jefferson County, Sheriff Mike Hale, Deputy Chief J. Paul Costa, Deputy Chambers, Deputy Daniels, and Nurse Langston. Townsend alleged that Chambers and Daniels violated her clearly established right to due process under the Fourteenth Amendment to the United

10

States Constitution in three ways: (1) by acting with deliberate indifference to Townsend's serious medical need, (2) by failing to provide adequate medical treatment to Townsend, and (3) by failing to intervene when Townsend received inadequate medical care.

After discovery, the deputies moved for summary judgment. The deputies argued that they are entitled to qualified immunity because they were acting within their discretionary authority when the alleged violation of Townsend's rights occurred and Townsend failed to present evidence that the deputies violated her clearly established civil rights. The deputies also moved to strike Brown's statement on the grounds that it was not provided to them during discovery and contained inadmissable hearsay.

The district court denied the deputies' motion for summary judgment. The district court dismissed Townsend's claim that the deputies failed to provide adequate medical treatment as duplicative of her claim that the deputies acted with deliberate indifference to her serious medical need, but the district court denied the motion for summary judgment as to Townsend's claims of deliberate indifference and failure to intervene. The district court ruled that the deputies were acting within their discretionary authority when the allegedly wrongful acts took place, but that the deputies were not entitled to qualified immunity because Townsend

11

had presented evidence that the deputies violated her clearly established rights under the Fourteenth Amendment. The district court also denied the deputies' motion to strike Brown's statement, but the district court "note[d] that it did not rely on the facts contained in the statement of Kiana Brown in ruling on the motions for summary judgment, and further, that it does not have enough information at this juncture to determine whether Brown's statement contained inadmissible hearsay." As to the deputies' objection about the late disclosure, the district court stated, "[the deputies] have the court's permission to depose Kiana Brown before trial despite the expiration of the discovery deadline."

## II. STANDARD OF REVIEW

We review <u>de novo</u> a denial of qualified immunity. <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1486 (11th Cir. 1996). In an appeal of a denial of summary judgment based on qualified immunity, "[a]ll evidence must be viewed in the light most favorable to the nonmoving party." <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1332 (11th Cir. 2004).

## III. DISCUSSION

"The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

12

constitutional rights of which a reasonable person would have known." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. ---, 129 S. Ct. 808, 815 (2009). "[Q]ualified immunity is a privilege that provides 'an immunity from suit rather than a mere defense to liability.'" Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008) (quoting Saucier v. Katz, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156 (2001)). "For this reason, the Supreme Court instructs courts to resolve 'immunity questions at the earliest possible stage in litigation.'" Case, 555 F.3d at 1325 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991)).

"To invoke qualified immunity, the official first must establish that he was acting within the scope of his discretionary authority" when the alleged violation occurred. Case, 555 F.3d at 1325. "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). "[T]he plaintiff must . . . show

13

that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Id. "The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. ---, 129 S. Ct. at 818.

Because it is undisputed that the deputies were acting within the scope of their discretionary authority when the alleged violation of Townsend's rights occurred, the burden shifted to Townsend to present evidence that the deputies violated her clearly established constitutional rights. Holloman, 370 F.3d at 1264. To prove her complaint of deliberate indifference and failure to intervene, Townsend had to present evidence that she had a serious medical need, the deputies were deliberately indifferent to that need, and her injury was caused by the deputies' deliberate indifference. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). To prove that the deputies were deliberately indifferent to her serious medical need, Townsend had to prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (alteration in original) (internal quotation marks omitted). The deputies argue that "[t]here

14

exists no evidence that . . . they did not respond reasonably to . . . a [substantial] risk [of serious harm to Townsend]."

Townsend presented evidence that she had a serious medical need, so the crux of this appeal is whether Townsend proved that the deputies were deliberately indifferent to that need and whether their alleged indifference caused Townsend to be injured. The district court faulted the deputies for their alleged knowledge that Townsend had received no medical treatment from a medical professional but each deputy knew that a medical professional, Nurse Langston, had seen and spoken with Townsend. We address Townsend's complaint against each deputy separately.

### A. Townsend Has Not Presented a Genuine Issue of Material Fact as to Whether Deputy Chambers Was Deliberately Indifferent to Her Serious Medical Need.

Although Townsend presented evidence that Chambers was aware of Townsend's condition, there is no evidence that Chambers disregarded a risk of serious harm by conduct that is more than gross negligence. It is undisputed that Chambers told Nurse Langston about Townsend's complaints, knew that Langston visited Townsend while she was conducting a "pill pass," and "heard Langston advise Townsend that she would see her after her 'pill pass' duties." It is also undisputed that Chambers spoke with Nurse Langston after Langston saw Townsend. Langston told Chambers that Townsend's condition was not an

15

emergency, but that Langston would consult a doctor.

Townsend has not presented a genuine issue of material fact as to whether Chambers knew that Langston's assessment of Townsend's condition was erroneous or later became aware that Townsend's condition worsened and became an emergency. Townsend alleges that she called "the deputies" several times on the intercom after she last saw Langston, but Townsend admits that she does not know with whom she spoke, and Townsend failed to describe the contents of the conversation. Nix alleges that she and Mejia attempted to get help when Townsend's condition "got worse" after she saw Langston, but Nix alleges only that "we told them the problem." Nix does not identify with whom they spoke. Neither Nix's nor Townsend's statements provide enough detail for a reasonable jury to find that Chambers knew that Townsend's condition became an emergency after Nurse Langston told Chambers that Townsend's condition was not an emergency.

B. *Townsend Has Not Presented a Genuine Issue of Material Fact as to Whether Her Injury Was Caused by Any Indifference by Daniels.*

Daniels knew less than Chambers about Nurse Langston's evaluation of Townsend, but Townsend failed to present any evidence that her injury was caused by any indifference by Daniels. Goebert, 510 F.3d at 1326. "An inmate who complains that delay in medical treatment rose to a constitutional violation must

16

place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n.9, 122 S. Ct. 2508, 2515 n.9 (2002)). Townsend failed to provide medical records, expert testimony, or other evidence, other than her own testimony, that any delay in treatment caused her to suffer any injury. It is undisputed that Daniels informed Langston of Townsend's complaints, knew that Langston visited Townsend while she was conducting a "pill pass," and "heard Langston advise Townsend that she would see her after her 'pill pass' duties." Although there is no evidence that Daniels heard Langston say that Townsend's situation was not an emergency, it is undisputed that Langston had determined that Townsend's condition was not an emergency. Townsend failed to present evidence that the referral to Nurse Langston of another complaint about Townsend's condition would have caused Langston to respond in a manner that would have made a difference for Townsend. Townsend presented no evidence that she would have received different treatment had Daniels not delayed her response to Townsend's renewed complaints of pain.

## IV.  CONCLUSION

The denial of the deputies' motion for summary judgment is **REVERSED**,

and we **RENDER** a judgment in favor of the deputies.

       **REVERSED** and **RENDERED.**