[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12373
_____

D.C. Docket No. 7:16-cv-00843-LSC

PHILLIP CORDELL FIKES,
as the personal representative of the Estate of Phillip David Anderson,

Plaintiff - Appellee,

versus

RON ABERNATHY, et al.,

Defendants,

PATRICK COLLARD,
KENNETH ABRAMS,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(November 8, 2019)

Before MARCUS, JULIE CARNES, and KELLY,[*] Circuit Judges.

PER CURIAM:

Phillip Anderson died of a perforated duodenal ulcer while in custody at the Tuscaloosa County jail. Phillip Fikes, his son and the personal representative of his estate, brought this civil rights action against Deputy Sergeant Kenneth Abrams and Detention Officer Patrick Collard and other officials, alleging that they acted with deliberate indifference to Anderson's serious medical needs in violation of the Eighth Amendment. Abrams and Collard moved for summary judgment on the basis of qualified immunity; the district court denied the motion. Abrams and Collard then filed this interlocutory appeal.

After careful review, we affirm. The facts taken in the light most favorable to Fikes state a violation of Anderson's clearly established constitutional rights. A jail official who knows that an inmate is suffering from a serious medical condition and is deliberately indifferent to his needs violates the Constitution. This summary judgment record, when taken in Fikes's favor, shows that Abrams and Collard interacted with Anderson repeatedly during his short time in custody, that his serious and intensifying need for further medical treatment was clear and obvious to a lay observer, and that Abrams and Collard mocked and ignored the inmate's

---

[*] Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by designation.

complaints. If these allegations are true, Officers Collard and Abrams are not entitled to qualified immunity and we affirm the judgment of the district court.

## I.

Because we are reviewing the district court's denial of summary judgment, we begin with a description of the facts taken in a light most favorable to the plaintiff and our decision must accept those facts. Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013). Phillip Anderson was arrested on February 7, 2015, on an outstanding warrant for contempt of court after he failed to appear at a child support hearing. During the intake process at the Tuscaloosa County jail that day, Anderson reported that he had health issues and took three daily medications -- propananol for hyperthyroidism, albuterol for COPD, and tromodol for shoulder pain. On February 9, 2015, Anderson saw Dr. Phillip Bobo, a doctor employed by a nonprofit that provided medical services for the jail. Dr. Bobo prescribed naproxen, an anti-inflammatory drug, which Anderson took several times before refusing to take this medicine. Fikes claims that Anderson never received his usual daily medication. On February 12, Anderson's daughter Erica Fikes visited the jail to deliver his thyroid medication, but she was told that she could not give it to him because it was not in its original box, although the medication was in the original bottle.

3

Anderson was ill throughout his short time in jail, suffered severe pain, and was unable to keep food down.  Appellants Kenneth Abrams, a deputy sergeant in the Tuscaloosa County Sheriff's Office, and Patrick Collard, a detention officer, were shift supervisors covering the area where Anderson was held.  Collard worked on five of the eight days leading up to Anderson's death, and Abrams worked on four.

Two inmates in Anderson's cellblock claimed that "Abrams and Collard bull[ied] Mr. Anderson by making fun of him and yelling at him to get up and quit faking . . . even though it was obvious that Mr. Anderson was in terrible pain and just getting worse by the day."  Decl. of Kenneth Brifford at 3; Decl. of Eric Ligon at 3.  Each of them recalled that Abrams and Collard "told Mr. Anderson that they knew he was just faking it."  Brifford Decl. at 6; Ligon Decl. at 6.  Another inmate said that "Abrams and Collard were well aware of [Anderson's condition] and were a big part of the problem."  Decl. of Gaffery Buggs at 2.  This inmate recalled that Abrams and Collard "bull[ied]" Anderson and accused him of faking his condition.  He added that Abrams and Collard "seemed to have no interest whatsoever in getting [him] the medical care he needed for his condition."  Id. at 4.

On Friday, February 13, Anderson was given medication for constipation, including milk of magnesia and a fleet enema.  The next evening, Detention Officer Jeremiah Van Horn told the supervisor on duty that Anderson was

4

complaining of stomach pain and shortness of breath and that he had been unable to eat for a number of days.  Van Horn later said that he "thought Mr. Anderson was in very seriously bad shape and needed immediate medical attention," and "that whatever the nurses had been doing for him obviously was not working as he was in terrible pain, short of breath, and barely able to move."  Decl. of Jeremiah Van Horn at 3.  He added that Anderson "was in obviously serious, critically bad shape in need of serious medical treatment," and "[e]veryone present could see that."  Id. at 5.

The supervisor called a nurse, who reported that Anderson was receiving treatment for constipation.  Another nurse said that her superiors had told her that "Anderson [was] not going to the hospital no matter what," and she was not willing "to lose her job over it by sending him to the hospital."  Later, Anderson was taken to the jail's medical clinic.  Two nurses took his temperature and blood pressure and consulted with Dr. Bobo, who said he could not see Anderson until Monday, February 16th, two days later.   Anderson received a liquid medication that he could not keep down; he was taken back to his cell.  Around 11 p.m. on Saturday, February 14th, the supervisor and two other detention officers saw Anderson lying on his bed in pain, groaning and holding his stomach, and unable to speak. Medical staff again told the detention officers that Anderson was being treated for constipation and said that he would be put on a liquid diet the following day.

5

After midnight, two more detention officers responded to noises coming from Anderson's cellblock. They saw Anderson lying on the floor, moaning and holding his stomach, which was visibly distended. They alerted a nurse, who said that she had already informed her supervisors of his condition and that she was told not to send Anderson to the hospital. Shortly thereafter, the supervisor directed a detention officer to take Anderson back to the medical clinic, where he received no additional medication before being returned to his cellblock. Several inmates reported that Anderson screamed in pain throughout the night.

Abrams and Collard came on as daytime supervisors at 7 a.m. on February 15, 2015. Van Horn explained that incoming supervisors ordinarily are briefed about any notable events from the night shift and anything that might require their attention. Anderson's repeated trips to the medical unit are reported in the log. According to Fikes's version of the facts, Anderson fell to the ground while walking to the bathroom that morning and the inmates began beating on the door to get someone's attention. Abrams and Collard then entered the cellblock and, according to an inmate, Collard "yanked him up by the back of his shirt and said out loud that [he] had fallen down on purpose[,] threw him back on his bed[,] and said that the nurses had done all they could and that [he] was just faking." Buggs Decl. at 7.

6

Around noon, a different detention officer responded to Anderson's cellblock after hearing inmates kicking at the door.  He saw Anderson lying on the floor with inmates holding his head; they reported that Anderson had passed out.  Anderson did not respond to questions from the officer; a nurse then came in and shouted at Anderson to stop faking.  She then directed the inmates to lie Anderson down on the ground in a pool of urine.  She asked Collard to get a wheelchair; he returned slowly with a broken one.  The other detention officer called in a medical emergency, and a different nurse and an officer then performed CPR and used a defibrillator to attempt to resuscitate Anderson.  Anderson was taken to an off-site emergency room where he was quickly pronounced dead.  The cause of death was determined to be an untreated perforated duodenal ulcer.  According to an inmate, after Anderson died Abrams told the inmates in his cellblock that they "should not discuss what happened to Mr. Anderson with anyone."  Id. at 8.

The personal representative of Anderson's estate, his son Phillip Fikes, sued in the United States District Court for the Northern District of Alabama.  The amended complaint named Tuscaloosa County Sheriff Ron Abernathy, Chief of Jail Operations Eric Bailey, Abrams, Collard, Tuscaloosa County, and the United States[2] as defendants.  Fikes's civil rights claim alleged deliberate indifference to

---

[1] Whatley Health Services, Inc., the nonprofit that the jail contracted with to provide medical services, has been "deemed an employee of the Public Health Center by [the Department of Health and Human Services]," thus implicating the federal government.  The government filed

7

Anderson's serious medical needs in violation of the Eighth Amendment's prohibition on cruel and unusual punishments, and his state law claims alleged negligence, wrongful death, and the intentional infliction of emotional distress.[3]

At the close of discovery, the court granted summary judgment to Tuscaloosa County, Abernathy, and Bailey on all claims. The court concluded that Tuscaloosa did not breach its duty to properly fund medical treatment for those held in the jail, that there was no causal link between Tuscaloosa policy and Anderson's death, and that there was insufficient evidence to establish supervisory liability on the part of Abernathy or Bailey.

The court denied Abrams and Collard's motion for summary judgment, however, on the deliberate indifference claim, concluding that genuine issues of material fact precluded the entry of summary judgment. The record taken in a light most favorable to the plaintiff showed that "both Abrams and Collard laughed at Anderson -- making fun of him and calling him a faker on numerous occasions," while "the seriousness of Anderson's condition would have been obvious even to a lay person." See Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989).

---

an answer admitting liability as to Fikes's claims under the Federal Tort Claims Act, contesting only the amount of damages.

[2] The district court dismissed the state law claims against Tuscaloosa County, Abernathy, Bailey, and Abrams on various state law grounds, including official immunity under Alabama law. See Ala. Const. art. I, § 14; Ex parte Davis, 930 So. 2d 497, 500 (Ala. 2005). The only remaining state law claims are negligence and wrongful death claims against Collard.

8

Soon thereafter, Abrams and Collard filed this interlocutory appeal in our Court claiming that they were entitled to qualified immunity. The district court stayed further proceedings pending the resolution of the appeal.

II.

We review the denial of summary judgment on the basis of qualified immunity de novo, applying the same standards as the district court. Feliciano, 707 F.3d at 1247. We "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003).

Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine is designed to permit "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). It therefore "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Id. (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"In order to receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Lee, 284 F.3d at 1194 (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)).  After the defendant makes this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.  The parties do not dispute that Abrams and Collard were acting within the scope of their discretionary authority.  To defeat their claim to qualified immunity, then, "(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct." Taylor v. Hughes, 920 F.3d 729, 732 (11th Cir. 2019).

## A.

Fikes argues that Abrams and Collard violated Anderson's constitutional rights by their deliberate indifference to his serious medical needs.  The Supreme Court has long held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's prohibition on cruel and unusual punishments. Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the

10

pain resulting from his or her illness." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999).  Inadequate medical care in prison implicates the Eighth Amendment because "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."  Estelle, 429 U.S. at 103.  A failure might result "in pain and suffering which no one suggests would serve any penological purpose," or in more severe cases produce "physical torture or a lingering death" -- thus causing "'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Id. at 103–04 (citations omitted) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

To prevail on this kind of claim, a plaintiff must establish "1) an objectively serious medical need and 2) [that the] defendant . . . acted with deliberate indifference to that need."  Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010).  The second element has objective and subjective components, requiring that "the defendant must 1) have subjective knowledge of a risk of serious harm, 2) disregard that risk, and 3) display conduct beyond gross negligence" to be held liable.  Id.

Abrams and Collard do not dispute that Anderson had objectively serious medical needs, and for good reason.  The only dispute is whether they were deliberately indifferent to those needs.  Abrams and Collard make three arguments: first, they claim that the record lacks evidence that they were personally

11

deliberately indifferent to his needs; second, that they lacked knowledge of Anderson's untreated medical needs; and finally, that because Anderson was receiving some medical attention, they were entitled to rely on the treatment decisions of the medical professionals.

For starters, Abrams and Collard argue that Fikes has presented no evidence that either defendant was deliberately indifferent to any of Anderson's medical needs. "[S]ince neither respondeat superior nor vicarious liability exists under § 1983," Fikes must establish that Abrams and Collard were personally deliberately indifferent to Anderson's needs. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1116 (11th Cir. 2005). Individual liability can be established by proving that "the official was personally involved in the acts that resulted in the constitutional deprivation," that "a policy or custom that he established or utilized results in deliberate indifference to an inmate's constitutional rights," or that "he breach[ed] a duty imposed by state or local law" and that the breach caused the plaintiff's injury. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam).

On this record, the argument fails because taking the facts in the record as true, and drawing all reasonable inferences in favor of the plaintiff, as we must at this stage in the case, there is sufficient evidence that Abrams and Collard were deliberately indifferent. Several inmates reported that Abrams and Collard in

12

particular knew about the inmate's condition since shortly after Anderson had arrived at the jail on February 7, 2015, and they knew that nothing was being done to ensure that he received adequate treatment. One inmate put it this way:

> [Anderson] clearly and obviously was in tremendous pain and it was getting progressively worse from [February 10] until his death. Nothing was being done for Mr. Anderson to actually help his condition. Abrams and Collard were well aware of this and were a big part of the problem.

Brifford Decl. at 2; see also Ligon Decl. at 2 ("They just kept giving him the same things like enemas, suppositories, and mineral water and it was obvious to the jailers and the medical staff and certainly to all of us that he was just getting progressively worse."); Buggs Decl. at 2–4 ("[Abrams and Collard] seemed to have no interest whatsoever in getting [Anderson] the medical care he needed for his condition.").

These inmates also attested that Abrams and Collard repeatedly made fun of Anderson's condition and accused him of malingering. One said that "[t]he jailers came in and laughed at Mr. Anderson each day and accused him of just faking being sick and in pain," and "[s]pecifically, [he] recall[ed] Abrams and Collard bullying Mr. Anderson by making fun of him and yelling at him to get up and quit faking." Brifford Decl. at 2–3; see also id. at 5 ("I remember Abrams and Collard coming into the cell block and they began yelling at Mr. Anderson, with Collard putting his face close to Mr. Anderson's face while he screamed at him. Abrams

13

and Collard told Mr. Anderson that they knew he was just faking it and that he needed to stop faking and just get up."); Buggs Decl. at 3–4 ("[Abrams and Collard] and others just laughed at Mr. Anderson, ignored his pain and obviously serious condition and yelled at him, calling him a faker.").

What's more, several inmates said that Collard accused Anderson of faking his condition even after he collapsed on the morning he died. Inmate Buggs related that "Abrams and Collard came in and with Mr. Anderson on the floor from having fallen, Collard yanked him up by the back of his shirt and said out loud that Mr. Anderson had fallen down on purpose and he threw him back on his bed and said that the nurses had done all they could and that Mr. Anderson was just faking." Buggs Decl. at 6–7.

In response, Abrams and Collard assert that none of this is true. But we cannot pick and choose what evidence to believe and what to reject on summary judgment. All we can say is that taking the facts in a light most favorable to the plaintiff, there is a genuine dispute of material fact as to whether Abrams and Collard were personally involved in conduct that amounted to deliberate indifference to Anderson's acute medical needs.

Abrams and Collard also say they are shielded from liability because they lacked subjective knowledge of Anderson's medical condition. The officers are correct that our cases require that an official have "subjective knowledge of a risk

14

of serious harm" before he may be held liable for deliberate indifference.  Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007). We have said that "[t]o be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs so that knowledge can be inferred."  LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993).  In other words, the indifference to an inmate's needs must be truly deliberate, not merely negligent or accidental.

A plaintiff, however, is not required to produce direct evidence of a defendant's mental state.  "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'"  Goebert, 510 F.3d at 1327 (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)).  The Supreme Court has explained that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.  The record in this case, when drawn in plaintiff's favor, supports the determination that it was obvious Anderson's condition was worsening throughout his stay, and that he needed emergency medical attention.  That is enough to support an inference that Abrams and Collard were subjectively aware of a palpable risk of serious harm.

15

Detention Officer Jeremiah Van Horn's declaration provides the strongest evidence on this point. He described Anderson's condition on February 14 this way:

> Mr. Anderson looked like he was in terrible shape physically and he was obviously in great physical pain and distress. He was unable to speak loudly; but he was moaning and groaning and holding his stomach. He complained about tremendous pain in his stomach, which looked to be sticking out abnormally, and he complained of shortness of breath and said that for days he had been throwing up everything he was given. Other inmates present emphasized to me that Mr. Anderson had been in terrible pain from his stomach and had not eaten or gone to the bathroom in days. He was obviously unable to move out of bed on his own.

Van Horn Decl. at 3. Van Horn said that he immediately contacted a supervisor and told him that Anderson "was in very seriously bad shape and needed immediate medical attention." Id. After being informed that Anderson had already seen a nurse, Van Horn responded that "someone had to do something immediately for Mr. Anderson and that whatever the nurses had been doing for him was obviously not working as he was in terrible pain, short of breath, and barely able to move." Id. at 3. Van Horn added that Anderson "was in obviously serious, critically bad shape in need of serious medical treatment. Everyone present could readily see that." Id.

Notably, Van Horn took it upon himself to repeatedly check on Anderson's condition on the night of February 14, which strongly suggests that Anderson's

16

need for immediate medical care was clear and obvious to a non-medically trained jail official.

Third, Abrams and Collard argue that they did not violate Anderson's constitutional rights because they reasonably relied on the assurances by trained medical staff that he was receiving appropriate treatment. On this record, however, a reasonable factfinder could determine that they acted with deliberate indifference by not doing more. For starters, the description of Anderson's dire medical condition offered by Van Horn and the inmates, along with the various accounts of his gradual deterioration, speak against any suggestion that Anderson had received appropriate treatment from the medical staff. Van Horn put it this way: "whenever [Anderson] saw the medical staff they just kept giving him the same things despite him telling them that he could not keep down what they made him take, that nothing they were doing was working and that he was only getting worse by the day, not better." Id.

Moreover, there is a genuine dispute about whether it was reasonable to accept the medical staff's conclusion that, on Saturday, February 14, Anderson could wait to see a doctor until Monday. As Van Horn put it, "[b]y this time on February 14, 2015, he had been in excruciating pain from his stomach for days, his stomach was sticking out badly and was hard to the touch, he could not move on his own, he could not respond to questions, and this was well known to everyone in

17

the cell block." Id. at 5. A reasonable officer, even one who is not a medical professional, should have recognized that urgent medical care was required. The conclusion is bolstered by evidence that a nurse said that she had been directed by her boss not to send Anderson to the hospital, and that "she [was] not going to lose her job over it." Id. at 6. Abrams and Collard were not required to overrule any well-considered treatment decisions of medical professionals; they were required, however, to notice that Anderson's condition was very serious and getting worse and intervene to get him the medical attention he obviously needed.

The facts in the record viewed in a light favorable to the plaintiff show that (1) Abrams and Collard knew about Anderson's condition; (2) Anderson's condition was visibly serious to a lay person without medical training and getting substantially worse by the day; (3) Abrams and Collard yelled at him and accused him of faking it, even up until the day of his death; and (4) Abrams and Collard did nothing to ensure that he got medical attention, even when another detention officer thought that emergency medical care was obviously necessary. On this record, a jury reasonably could conclude that Abrams and Collard failed to take meaningful action to get Anderson medical treatment.

On the plaintiff's version of the facts, Anderson's constitutional rights were violated by Abrams and Collard's deliberate indifference to his serious medical needs.

B.

Even if Anderson's constitutional rights were violated, however, Abrams and Collard still would be entitled to qualified immunity unless that right was clearly established at the time.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  A plaintiff can show the violation of a clearly established right in three ways.  "First, and most commonly, a plaintiff can point to a case with 'materially similar' facts decided by the Supreme Court, the Court of Appeals, or the highest court of the relevant state.  Or, a plaintiff can 'show that a broader, clearly established principle should control the novel facts in this situation.'  The final, and often most difficult option is to demonstrate that 'the official's conduct 'was so far beyond the hazy border between [unlawful] and acceptable [conduct] that [the official] had to know he was violating the Constitution even without caselaw on point.'"  Sebastian v. Ortiz, 918 F.3d 1301, 1310 (11th Cir. 2019) (citations omitted).

Abrams and Collard argue that it was not clearly established that officials can be held liable for deliberate indifference when an inmate is receiving medical treatment.  Fikes, however, responds that a long line of cases in this Circuit clearly

19

established at the relevant time that Anderson's rights were being violated. Three of our cases define the contours of the relevant right.

First, in Carswell v. Bay County, 854 F.2d 454 (11th Cir. 1988), a panel of this Court held that there was sufficient evidence to find that a jail administrator and a physician's assistant were deliberately indifferent to an inmate's medical needs even though he received some medical care. Id. at 457. The plaintiff, Carswell, had repeatedly requested treatment for a rash, constipation, and significant weight loss, and he received the medication he requested "on some occasions but other requests were simply ignored." Id. at 455. He was prescribed a cream for the rash and diagnosed with tonsillitis and constipation and given the appropriate medication, though he continued to complain and he continued to lose weight. Id.

After seeing him at a court appearance, his public defender observed that Carswell "looked like a concentration camp victim" and directly asked the administrator to get him medical attention, which did not happen. Id. Two days later, the physician's assistant examined him again and noted that the inmate had lost over fifty pounds in eleven weeks in jail. Id. Carswell was taken to the hospital where he was diagnosed with diabetes. Id. The Court concluded that the evidence showed that both defendants "had knowledge of Carswell's need for medical care," that they "ignored the warnings," and that the nonmedical official in

20

particular saw "Carswell's deteriorating condition during rounds at the jail," "received a request specifically addressed to him from Carswell for medical attention," and "did nothing significant to ensure that Carswell received medical attention." Id. at 457. That constituted deliberate indifference, despite the fact that Carswell had received some medical attention and the relevant official was not a medical professional.

Later, in Goebert v. Lee County, 510 F.3d 1312 (11th Cir. 2007), another panel of this Court reversed a grant of summary judgment in favor of the facility commander of a jail, Captain Weaver, in a deliberate indifference case. There, the plaintiff was pregnant and received adequate care for about the first month of custody. Id. at 1317. Then she began leaking fluid and she was seen by the jail doctor on two occasions. Id. As her condition worsened, nurses refused to take her to the doctor, at times refused to accept her written medical request forms, and eventually refused to give her forms to fill out. Id. at 1318. After about a week of this, she wrote to Captain Weaver that the medical staff was "unconcerned" with her condition and that she needed to see an outside obstetrician instead of the jail doctor. Id. She added that she had lost a pregnancy the previous year when her water broke early. Id. She saw the jail doctor the following day, who referred her to an outside doctor, and four days later she finally received administrative authorization to receive outside medical assistance. Id. at 1319. When she arrived

21

at the hospital, it was discovered that she had lost nearly all of the amniotic fluid in her womb.  Id.  She lost the pregnancy two days later.  Id.

This Court held that Weaver, a nonmedical official, was not entitled to qualified immunity from the inmate's deliberate indifference claim.  As the Court explained, Weaver had "abundant reason to believe that her medical need was serious."  Id. at 1327.  Most relevant, the Court rejected the argument that Weaver was not liable because she was under the care of the prison medical staff:

> The fact that Goebert had been seen by Dr. Brown does not mean that a layman could not tell that she had a serious medical need at the time Captain Weaver received her complaint.  For one thing, her complaint stated that Brown had recommended that she see an obstetrician.  For another, her complaint made it clear that the medical staff who had seen Goebert had not attended to her needs.  A lay person would recognize the need for an obstetrician's attention in the circumstances that Goebert described to Weaver, including Brown's recommendation to that effect, and a factfinder could reasonably conclude from the evidence that Weaver himself did recognize that need.

Id. at 1327–28 (emphasis added).  The Court relied heavily on Carswell, which it understood had placed Weaver on fair notice that "his actions or inaction violated Goebert's constitutional right to timely treatment of her serious medical needs."  Id. at 1331.

More recently, in Townsend v. Jefferson County, 601 F.3d 1152 (11th Cir. 2010), a panel of this Court held that two deputy county jail officials were entitled to qualified immunity, distinguishing Carswell and Goebert.  In this case, the

22

plaintiff was pregnant and began to experience abdominal pain and vaginal bleeding the morning after her arrest. Id. at 1154. She and other inmates contacted the deputies, and she saw a nurse that evening, who concluded that her condition was not an emergency and decided to see her only after administering medication to other inmates. Id. at 1155–56. An hour or two later, she met with the nurse, who again told her that it was not an emergency, albeit without conducting any examination. Id. at 1156. The nurse told one deputy that she did not think the plaintiff's condition was an emergency, but she would consult a doctor. Id. The nurse later asked another nurse to see the plaintiff, but she was never brought to the medical clinic as a result of an apparent miscommunication. Sometime in the next two hours, the plaintiff suffered a miscarriage. Id.

The Court held that no reasonable jury could conclude that the deputy county jail officials were deliberately indifferent. The Court reasoned:

> [One deputy] had been told by a medical professional that Townsend was not presenting an emergency, and although [the other] had not received the same report, [she] knew that a medical professional had spoken with Townsend and determined that Townsend could wait several hours for further evaluation. Townsend has not presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged Townsend's condition. Townsend also has not offered evidence that either [of the two deputies] must have known that [Nurse] Langston had ignored what she knew to be Townsend's serious medical need so that she could complete her pill pass on schedule because, for example, Langston had previously exhibited deliberate indifference in carrying out [her] responsibilities.

23

Id. at 1159 (citations and quotation marks omitted).

As these cases make clear, when an inmate's medical condition is so obviously dire that a nonmedical official must know that the inmate requires additional medical attention, that official can be held liable for deliberate indifference if he does nothing. Carswell and Goebert clearly established that a nonmedical official does not fulfill his obligations to an inmate whose condition is clearly deteriorating merely by obtaining some medical attention for the inmate, if it is plain and obvious to a person without medical expertise that the care is inadequate and insufficient.

The record evidence in this case supports Fikes's claim that it would have been obvious to any lay person that Anderson was not receiving adequate treatment for a medical condition that was steadily deteriorating over a few short days. Again the most powerful piece of evidence comes from jail official Van Horn, who, like Abrams and Collard, was not a medical professional. Van Horn said that by February 14 (the night before the inmate died) Anderson "was in very seriously bad shape and needed immediate medical attention" and that he could tell "that whatever the nurses had been doing for him obviously was not working." He emphasized that Anderson "badly needed" emergency treatment and that "from all appearances [was] suffering from a very serious, life-threatening medical problem and getting worse." He repeated that Anderson "was in obviously serious,

critically bad shape in need of serious medical treatment," and "[e]veryone present could see that."

Just like in Goebert, "[a] lay person would recognize the need for [a physician's] attention in the circumstances" described by Van Horn and others. The evidence, taken in a light most favorable to the plaintiff, establishes that Anderson's condition was serious, getting worse, and ultimately became critical. Instead of taking any actions, Abrams and Collard mocked him and accused him of faking his condition. Goebert and Carswell provided them with fair notice.

On this record, we are satisfied that there is enough evidence, if credited, to take this case to a jury because Anderson's constitutional rights were violated and our case law clearly established that at the time Abrams and Collard acted. We affirm.

**AFFIRMED.**