[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11929

_____

D.C. Docket No. 1:19-cv-21148-RNS

BRYAN BOIGRIS,

Plaintiff -
Counter Defendant -
Appellant,

versus

EWC P&T, LLC,
a Florida limited liability company,

Defendant -
Counter Claimant -
Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 6, 2021)

Before JILL PRYOR, NEWSOM, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

EWC P&T, LLC ("EWC") runs the nationwide beauty brand European Wax Center and holds the trademark "European Wax Center." Bryan Boigris used GoDaddy.com to register the domain names "europawaxcenter.com" and "euwaxcenter.com." Perhaps predictably, he found himself defending against an Anti-Cybersquatting Consumer Protection Act ("ACPA") claim filed by EWC in federal district court. See 15 U.S.C. § 1125(d). EWC alleged that Boigris registered his domain names with a bad faith intent to profit from their confusing similarity to EWC's "European Wax Center" mark. Boigris now appeals the district court's grant of summary judgment in favor of EWC. He does not challenge the district court's conclusions that EWC's "European Wax Center" mark is entitled to protection and that he registered his domain names in bad faith, intending to profit from EWC's mark. His only quarrel is his claim that a jury should decide whether his domain names are confusingly similar to EWC's mark. But because, as we see it, no reasonable juror could conclude that "europawaxcenter" and "euwaxcenter" are not confusingly similar to "European Wax Center" -- they are nearly identical to the mark in sight, sound, and meaning -- we affirm the district court's order granting summary judgment.

2

I.

EWC operates a national brand offering hair removal services and beauty products under the trademark "European Wax Center."  It "has a franchise system of more than 740 European Wax Center locations in the United States," and, since 2015, has sold cosmetics under the marks "reveal me," "renew me," and "smooth me."  EWC's website domain name is www.WaxCenter.com.

Bryan Boigris has never done any work related to the production of beauty products.  His only conceivable connection to the beauty industry is his purported ownership of www.shopblok.com, which sources and sells "private label" "consumer goods in multiple retail categories, including, but not limited to, cell phone cases, shapewear and fitness, home and garden[,] jewelry[,] and health and beauty."  Notwithstanding his lack of a beauty background, in April 2016, Boigris claimed that he intended to create and sell a line of cosmetic and skin-care products and applied to register trademarks for "reveal me," "renew me," and "smooth me" with the U.S. Patent & Trademark Office.  Boigris had neither used these marks in commerce nor contacted manufacturers or suppliers in connection with his purported plan to sell cosmetics.  Separately, he registered eleven domain names via GoDaddy.com: EUWaxcenter.com, EuropaWaxCenter.com, WaxCenterMiami.com, WaxCenterOnline.com, WaxCenterCompany.com,

3

WaxCenterSolutions.com, WaxCenter.Solutions, WaxCenter.Miami, WaxCenter.Company, WaxCenter.Guru, and WaxCenter.Mobi.

In May 2016, EWC filed its own trademark applications for "reveal me," "renew me," and "smooth me" -- which it had been using in commerce since October 2015 -- and promptly sent Boigris a cease-and-desist letter.  In December 2016, EWC turned to the Trademark Trial and Appeal Board ("TTAB"), where it filed an opposition to Boigris's "reveal me," "renew me," and "smooth me" trademark registration applications.  EWC claimed that Boigris lacked a bona fide intent to use the marks in commerce, a prerequisite to registration under 15 U.S.C. § 1051(b)(1).  The TTAB agreed, granted summary judgment in favor of EWC, and refused Boigris's applications to register the trademarks "reveal me," "renew me," and "smooth me."

Boigris elected to contest the TTAB decision by filing a complaint in the Southern District of Florida instead of appealing to the Federal Circuit.  See 15 U.S.C. § 1071 (a trademark applicant dissatisfied with a TTAB disposition may either appeal to the Federal Circuit or file a civil action against the adverse party in district court).  Boigris's complaint sought reversal of the TTAB decision sustaining EWC's opposition to his trademark application; he also sought an affirmative declaration that he was entitled to register the "reveal me," "renew me," and "smooth me" marks.  EWC counterclaimed for a declaratory judgment

4

affirming the TTAB's rejection of Boigris's trademark applications; for a

declaratory judgment that it had priority rights in the disputed marks and that

Boigris's use of the marks would be trademark infringement under the Lanham

Act, 15 U.S.C. §§ 1114 and 1125(a); for statutory damages and an injunction under

the ACPA against Boigris's use of the "europawaxcenter.com" and

"euwaxcenter.com" domain names; and for damages under the Florida Unfair and

Deceptive Trade Practices Act ("FDUTPA").[1]

EWC moved for summary judgment on all claims and counterclaims and to

strike Boigris's Rule 56 Statement of Material Facts because it did not cite any

record evidence.  The district court granted EWC's motion to strike and deemed all

facts in EWC's Statement of Material Facts admitted.  Next, the court granted

summary judgment for EWC on all claims other than the FDUTPA counterclaim.

As for the TTAB decision and Boigris's claim that he was entitled to register

"reveal me," "renew me," and "smooth me," the district court found that Boigris's

evidence only underscored the conclusion that he lacked a bona fide intent to use

the disputed marks in commerce.  Shopblok.com did not even exist when Boigris

filed the trademark applications, and Boigris had admitted that his principal piece

---

[1] This was not Boigris's first brush with the FDUTPA.  In December 2019, Boigris stipulated to the entry of a consent judgment in order to resolve a Florida Attorney General action accusing him of sending fake "official" notices to thousands of new Florida businesses ordering them to send him payment in order to obtain a "Certificate of Status."  This scheme netted Boigris $337,045.50 in revenue.  Among other things, the judgment ordered Boigris to pay restitution in that amount.

of evidence -- unrecoverable notes on his old phone that supposedly related to the marks -- consisted only of "doodling" and that he could not remember the notes' contents. Therefore, the TTAB had correctly refused his applications. The district court also granted summary judgment to EWC on its Lanham Act trademark infringement counterclaim. The court declared that EWC had ownership rights in the marks, which it had used extensively in product lines sold to various franchises across the United States. Boigris's use of identical marks would likely confuse consumers.

The district court further held that EWC had proven each element of its Anti-Cybersquatting Consumer Protection Act counterclaim. First, its "European Wax Center" trademark was distinctive because it had been registered for five years and was incontestable under 15 U.S.C. § 1065. Second, the "europawaxcenter.com" and "euwaxcenter.com" domain names mostly incorporated EWC's mark and were confusingly similar to it. Third, Boigris had registered the domains out of a bad faith intent to profit. He registered eleven very similar domain names, he lacked any intellectual property rights in the domain names, and the domain names did not resemble his legal name.

Finally, the district court held that EWC had not proven the actual damages necessary to sustain an FDUTPA claim, but declined to exercise supplemental jurisdiction over this claim anyway and dismissed it without prejudice with leave

to refile in state court.  See 28 U.S.C. § 1367.  In a separate order, the trial court awarded $25,000 in statutory damages for each of the two ACPA-offending domain names, for a total of $50,000.  Boigris timely appealed only from the ACPA judgment; he did not challenge the district court's judgments affirming the TTAB decision and declaring that Boigris's use of the disputed marks would constitute infringement of EWC's trademarks.

## II.

We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to Boigris, the nonmoving party.  Tesoriero v. Carnival Corp., 965 F.3d 1170, 1177 (11th Cir. 2020).  Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks and citation omitted).

Congress passed the Anti-Cybersquatting Consumer Protection Act in 1999 in order to combat cybersquatting, or "the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks."  Sporty's Farm L.L.C. v. Sportsman's Mkt.,

7

Inc., 202 F.3d 489, 495 (2d Cir. 2000) (quoting S. Rep. No. 106–140, at 4 (1999));

see also S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1246 (11th Cir.

2009) ("The practice of holding domain names for ransom with an intent to profit

directly from selling the domain name itself is the 'paradigmatic harm' targeted by

the act.") (quoting Lucas Nursery and Landscaping v. Grosse, 359 F.3d 806, 810

(6th Cir. 2004)).

Codified at 15 U.S.C. § 1125(d), the law provides:

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that--

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

Thus, an ACPA plaintiff proceeding under § 1125(d)(1)(A)(ii)(I) must prove (1)

that its trademark was distinctive when the defendant registered the challenged

domain name; (2) that the domain name is identical or confusingly similar to the

plaintiff's trademark; and (3) that the defendant registered the domain name with a

bad-faith intent to profit. Jysk Bed'N Linen v. Dutta-Roy, 810 F.3d 767, 778 (11th Cir. 2015).

On appeal, Boigris does not challenge the district court's holding that EWC was entitled to summary judgment on the first and third of these elements. He does not argue that the district court erred in concluding that the "European Wax Center" mark was distinctive or that he registered the domain in bad faith. He objects only to the district court's holding that the two domain names that EWC listed in its ACPA counterclaim -- "europawaxcenter.com" and "euwaxcenter.com" -- were confusingly similar to EWC's "European Wax Center" trademark as a matter of law. Boigris says that there is a genuine issue of material fact in dispute on confusing similarity. But since, as we see it, no reasonable jury could conclude that the domain names are not confusingly similar to EWC's mark, Boigris's argument fails.

The parties agree that by employing the phrase "confusingly similar," "Congress intended simply a comparison of the mark and the allegedly offensive domain name." N. Light Tech., Inc. v. N. Lights Club, 97 F. Supp. 2d 96, 117 (D. Mass. 2000), aff'd, 236 F.3d 57 (1st Cir. 2001). Plainly, this inquiry is "narrower than the traditional multifactor likelihood of confusion test for trademark infringement" claims, Coca-Cola Co. v. Purdy, 382 F.3d 774, 783 (8th Cir. 2004), which, among other things, takes into account "differences between the goods or

9

services of the disputing parties," 5 McCarthy on Trademarks and Unfair

Competition § 25A:51 (5th ed. June 2021 Update) (Under the ACPA, "[i]t is only

the challenged domain name and the plaintiff's mark that are to be compared to

determine if the accused domain name is confusingly similar.").[2]  See also Sporty's

Farm, 202 F.3d at 498 n.11 ("We note that 'confusingly similar' is a different

standard from the 'likelihood of confusion' standard for trademark infringement . .

. .").

The ACPA requires a comparison solely of the mark and the allegedly

infringing domain names in order to determine whether they "are so similar in

sight, sound or meaning that confusion is likely."  Heron Dev. Corp. v. Vacation

Tours, Inc., No. 16-20683-CIV, 2018 WL 2943217, at *7 (S.D. Fla. June 12, 2018)

(quoting 5 McCarthy on Trademarks and Unfair Competition § 25A:51 (5th ed.

2017)), vacated on other grounds, 814 F. App'x 468 (11th Cir. 2020).  The

comparison considers the "secondary domain name" -- i.e., the text of the site's

name -- without regard for the "top level domain name" (.com, .net, etc.) or for any

---

[2] We evaluate seven factors to determine whether there is a likelihood of confusion between two marks in trademark infringement cases:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

Tana v. Dantanna's, 611 F.3d 767, 774–75 (11th Cir. 2010).

differences in capitalization (because domain names use only lowercase letters).

Sporty's Farm, 202 F.3d at 497–98; Prime Publishers, Inc. v. Am.-Republican, Inc., 160 F. Supp. 2d 266, 279–80 (D. Conn. 2001).

Thus, EWC accurately describes the relevant comparison this way:

| Boigris' Domain Names | europawaxcenter | euwaxcenter |
|---|---|---|
| EWC Trademark | europeanwaxcenter | europeanwaxcenter |

Boigris's domain names are confusingly similar in sight, sound, and meaning to EWC's mark. As for sight, the domains and the mark look the same. The "europawaxcenter" domain uses fifteen of the seventeen letters found in the "europeanwaxcenter" mark and arranges them in a very similar manner. The "euwaxcenter" domain uses eleven of the seventeen letters found in the "europeanwaxcenter" mark; again, the arrangement of the duplicate letters is nearly identical. Put another way, "europawaxcenter" is identical to "europeanwaxcenter" but for two deleted letters, and "euwaxcenter" but for six. And this is not a case in which "small differences in character count and arrangement . . . meaningfully affect a word's appearance" by transforming it into a wholly distinct, independently recognizable word, such as the difference between "QUIT vs. SUIT or SEQUEL vs. SEXUAL." Dissenting Op. at 25. The visual differences between QUIT and SUIT and between SEQUEL and SEXUAL are orders of magnitude greater than those between "euwaxcenter,"

11

"europawaxcenter," and "europeanwaxcenter," as are the differences in meaning. As for sound, the mark and the domain names sound quite similar when pronounced. The "waxcenter" portion of each phrase, at least, is <u>identical</u> in sound.

Finally, the domain names and the mark all impart essentially the same meaning: waxing services that are European or associated with Europe. To break it down, "waxcenter" -- the root phrase common to the mark and each domain name -- carries the same meaning across them all, namely a place where waxing services are offered. To this common root the mark adds "european," while the domain names add "europa" or "eu," respectively. Different types of services offered at waxing salons are commonly denominated by the geographic region associated with their style. A screenshot exhibit filed in support of EWC's motion for summary judgment, for example, shows a Facebook user posting a question about a "[B]razilian wax," a style of wax associated with Brazil.[3] Therefore, in the context of each disputed phrase, the most natural reading of the "eu" and "europa" additions is to specify that the place offering waxing services is in some way European or associated with Europe. The letters "eu" are a reasonably clear

---

[3] We do not make this observation in order to take into account "the goods or services of the parties," an inquiry the ACPA prohibits. 15 U.S.C. § 1125(d)(1)(A). Thus, for example, we do not ask which waxing services European Wax Center actually provides at its franchise locations. Rather, we examine the meaning of the disputed words in context. "Waxcenter" means a place where standard waxing services are offered, which in turn informs the most natural meaning of "eu" and "europa" when appended to this root.

abbreviation for "Europe" or "European." The website visitor could easily assume that "eu" is short for "European" and confuse the website with "europeanwaxcenter," the protected mark. And as EWC points out, "Europa" means "Europe" in Spanish. The same is true of several other languages such as German, Italian, and Portuguese. Europe, Collins German Dictionary, https://www.collinsdictionary.com/us/dictionary/english-german/europe (last visited Aug. 3, 2021); Europe, Collins Italian Dictionary, https://www.collinsdictionary.com/dictionary/english-italian/europe (last visited Aug. 3, 2021); Europe, Collins Portuguese Dictionary, https://www.collinsdictionary.com/dictionary/english-portuguese/europe (last visited Aug. 3, 2021). So at least one of the meanings of "europa" is nearly identical to that of its counterpart in EWC's mark. Cf. MasterCard Int'l Inc. v. Trehan, 629 F. Supp. 2d 824, 830–31 (N.D. Ill. 2009) (approving ACPA settlement and noting that the Hindi spelling of "mastercard.com" was confusingly similar to the trademark MASTERCARD despite its difference in appearance).

To be sure, Boigris is right that "eu" and "europa" could conceivably carry other meanings, such as, respectively, an abbreviation for the European Union or the Greek mythological mother of Minos, Rhadamanthus, and Sarpedon.[4]

---

[4] We note that with respect to the "europawaxcenter" domain, Boigris raised this meaning dispute for the first time only at oral argument. Both in his appellate and district court briefing,

Similarly, the dissent notes that "europa" can also refer to "a satellite moon of the planet Jupiter." Dissenting Op. at 26. But these are not the most obvious meanings of "eu" and "europa," much less ones the average internet user would readily associate with either of them. "Eu" and "europa" plainly call the European continent to mind. Indeed, even Boigris's alternate meaning of "eu" -- "European Union" -- is confusingly similar in meaning to the word "European" in context: "European Union Wax Center" is confusingly similar to "European Wax Center." Both strongly suggest a wax center that provides services that in some way are European in nature. And the typical internet user would not likely read "europa" to refer to a relatively minor character from Greek mythology or to one of Jupiter's 79 moons, at least not to the exclusion of reading the word to invoke Europe. Again, since it is common to use geographic terms to refer to waxing services, once the reader apprehends the meaning of "waxcenter," it is more natural to read the "Europa" prefix to refer to a geographic region than to a figure from antiquity or to a distant celestial object. Even those versed in astronomy and ancient Greek literature (or unfamiliar with the slate of services communicated by the term "waxcenter") might well perceive a meaning similar to "european": some posit that the European continent derives its name from the legend of the princess Europa,

---

Boigris addressed confusing similarity only at the highest level of abstraction and did not make any specific argument about the meaning of the word "europa."

14

whom Zeus abducted from her Phoenician home and relocated to Crete, that is, Europe. Jeff Wallenfeldt, Where Does the Name *Europe* Come From?, Encyclopedia Britannica, https://www.britannica.com/story/where-does-the-name-europe-come-from (last visited July 30, 2021). Jupiter's moon, in turn, is named after this European namesake. Europa, Encyclopedia Britannica, https://www.britannica.com/place/Europa-satellite-of-Jupiter (last visited July 30, 2021) ("German astronomer Simon Marius . . . named [the moon] after Europa of Greek mythology."). For the terms "eu" and "europa," it's Europe all the way down.

Thus, an association with Europe and things European is the most natural meaning of "eu" and "europa." At the very least, no one could dispute that it is one of their several meanings, and the confusing similarity standard requires no more in this case -- it does not require identity in meaning between the mark and domain name or even a showing that confusion actually has occurred or will occur in every case. See 15 U.S.C. § 1125(d)(1)(A)(ii)(I) (providing that the domain name must be "identical or confusingly similar to [the] mark") (emphasis added). The purported differences in meaning Boigris identifies relate only to subparts of the domain names and the mark, and in any event are not substantial. "Europa" and "eu" are hardly different words than "european"; they are most naturally read as different versions of the same word. Again, these slightly differing terms are

15

only modifiers added to a base that is identical across both domain names and EWC's mark: "waxcenter." Cf. Prime Publishers, 160 F. Supp. 2d at 279–80 (concluding, after a bench trial, that domain name ctvoices.com was confusingly similar to the trademark Voices). In short, Boigris's domain names and EWC's mark look almost identical, sound similar when pronounced, and do not substantially differ in meaning. They "bear such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved, and/or permitted" by EWC. Venetian Casino Resort, LLC v. Venetiangold.Com, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (citation omitted). No reasonable juror could reach any other conclusion.

Nevertheless, Boigris asserts that there is enough of a dispute about the meaning of the domain names to defeat summary judgment, even though the domains and the mark are plainly confusingly similar in sight and sound. On Boigris's logic, since "europa" can carry multiple meanings, the domain name "europa.com" would not be confusingly similar as a matter of law to a trademark for "europa." Nor would "europpa.com." But see Shields v. Zuccarini, 254 F.3d 476, 484 (3d Cir. 2001) ("A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are misspellings of distinctive or famous names."). We remain unpersuaded. The inclusion of a word within a domain name that happens to be a homonym of some

16

other word generally will not, without more, create a genuine issue of fact as to confusing similarity. At the very least, it does not do so when, as here, the rest of the domain name is <u>identical</u> in sight, sound, and meaning to the mark. In light of the indisputable sight and sound similarities between Boigris's domain names and EWC's mark, the potential differences in meaning Boigris identifies do not create a triable issue of fact on confusing similarity.

We need not decide whether, and on what facts, a difference in meaning could <u>ever</u> suffice to create a genuine issue of material fact on the confusing similarity element even when the mark and domain name are similar in terms of sight and sound. The sight, sound, or meaning standard does not appear in the ACPA's text. The ACPA says only that the domain and mark must be "confusingly similar"; it does not specify constituent parts of this requirement. 15 U.S.C. § 1125(d)(1)(A)(ii)(I) (the domain name must be "identical or confusingly similar to [the] mark"). Sight, sound, and meaning are tools courts (and, when appropriate, jurors) have used to compare the domain name and the mark. They are sensible tools, and courts should carefully examine sight, sound, and meaning when evaluating confusing similarity in ACPA cases. Indeed, we do so today. But sight, sound, and meaning are not independent statutory elements necessary to prove an ACPA claim. There is no requirement, in statute or case law, that a domain name be similar to a mark in sight, sound, <u>and</u> meaning in order to be

17

confusingly similar as a matter of law.  In fact, a leading treatise phrases the test in the disjunctive.  5 McCarthy on Trademarks and Unfair Competition, supra, § 25A:51  (Confusingly similar "means that the plaintiff's mark and the defendant's domain name are so similar in sight, sound or meaning that confusion is likely.") (emphasis added).

Thus, a number of courts have found in favor of ACPA claimants based on a close visual resemblance between the domain name and the protected mark, without expressly relying on similarity in sound or meaning.  See, e.g., Omega S.A. v. Omega Eng'g, Inc., 228 F. Supp. 2d 112, 127 (D. Conn. 2002) (finding that the "names [bore] such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved and/or permitted by" the owner of the mark); Venetian Casino Resort, LLC, 380 F. Supp. 2d at 743 (same); ZP No. 314, LLC v. ILM Cap., LLC, 335 F. Supp. 3d 1242, 1261 (S.D. Ala. 2018) (finding a domain name to be "virtually identical" to the protected mark).  And the Third Circuit has determined confusing similarity as a matter of law without even referencing the sight, sound, or meaning trilogy.  Zuccarini, 254 F.3d at 483 (domain names were confusingly similar to mark because they "closely resemble[d]" the mark "with a few additional or deleted letters, or . . . by rearranging the order of the words").

18

Instead of imposing a rigid requirement of confusing similarity in sight,

sound, and meaning in all cases, the ACPA commands a holistic analysis of

whether the domain name is confusingly similar to the mark, including

consideration of how the sight, sound, and meaning of the words operate together.

Thus, there might be a case in which an ACPA claimant could, by showing

overwhelming sight and sound similarity even though a domain and mark carry

markedly distinct meanings, establish that no reasonable juror could conclude a

domain and mark are not confusingly similar.[5]

On the other hand, there might well be a case in which the meaning is so

different as to create a genuine issue of fact on confusing similarity even though

the domain and mark are similar in sound and appearance.  In that event, a jury

should of course resolve the factual issue.  We do not confront either of these

hypothetical scenarios today, however.  What we have here is overwhelming

similarity in sight and sound plus an identical meaning in the core of each disputed

---

[5] Indeed, for purposes of the broader "likelihood of confusion" inquiry that governs claims of trademark infringement -- which takes into account the similarity of the marks in addition to other factors -- "a finding of similarity as to any one factor (sight, sound or meaning) alone may be sufficient to support a holding that the marks are confusingly similar" in an appropriate case. In re White Swan Ltd., 8 U.S.P.Q.2d 1534, at *2 (T.T.A.B. 1988) (internal quotation marks and citation omitted); see also Eveready Battery Co., Inc. v. Green Planet, Inc., 91 U.S.P.Q.2d 1511, at *9 (T.T.A.B. 2009) ("[S]imilarity in any one of the elements of sound, appearance or meaning is sufficient to support a determination of likelihood of confusion.  Therefore, although the marks have different meanings, this does not mandate a finding that there can be no likelihood of confusion, given the similarities in appearance and sound between [the marks at issue].") (internal citations omitted); 4 McCarthy on Trademarks and Unfair Competition § 23:21 (5th ed. June 2021 Update) ("In an appropriate case, a finding of similarity as to any one of the trilogy may be sufficient to support a holding of a likelihood of confusion.").

phrase ("waxcenter"), all against a whisper of a difference in meaning across a single modifier subpart of each phrase.  Like some of the domain names in Zuccarini, Boigris's names simply omit a few of the letters found in EWC's mark. It is sufficient for us to decide that against the background of the very striking sight-and-sound similarity between Boigris's domains and EWC's mark, any differences in meaning are marginal and not substantial enough that a reasonable juror could conclude from them alone that the domain names and the mark are not confusingly similar.

Boigris comes close to saying that confusing similarity is an inherently factual question that can never be resolved as a matter of law on a motion for summary judgment.[6]  But this is not law.  When, as here, no reasonable juror could conclude that a trademark and a challenged domain name are anything other than confusingly similar, courts routinely grant summary judgment to ACPA claimants. Zuccarini, 254 F.3d at 483 (domain names joescartoon, joecarton, joescartons, joescartoons, and cartoonjoe were confusingly similar to the trademark Joe Cartoon); Fuccillo v. Silver, No. 8:18-CV-1236-T-36AEP, 2020 WL 5758001, at

---

[6] Thus, Boigris's brief includes this Court's decision in S. Grouts as part of a string citation supporting the phrase "summary judgment is entirely improper when there is a dispute regarding whether a domain name is 'confusingly similar' to a purported trademark."  But, notably, S. Grouts affirmed summary judgment in favor of an ACPA defendant and relied on the bad faith element; it did not consider confusing similarity.  575 F.3d at 1243–50.  In the same string citation, Boigris includes Meth Lab Cleanup, LLC v. Bio Clean, Inc., 205 F. Supp. 3d 1243 (W.D. Wash. 2016), which granted summary judgment against a Lanham Act trademark infringement plaintiff and did not even discuss the ACPA.

*8 (M.D. Fla. Sept. 28, 2020) (domain name billyfuccillo was confusingly similar to the trademarks Fuccillo and Billy Fuccillo); <u>ZP No. 314, LLC</u>, 335 F. Supp. 3d at 1261 (domain names liveonetenmobile, liveontenmobile, and onetenstudentliving were, "as a matter of law," confusingly similar to trademarks One Ten and One Ten Student Living); <u>Web-adviso v. Trump</u>, 927 F. Supp. 2d 32, 40–41 (E.D.N.Y. 2013) (domain names trumpbeijing, trumpindia, trumpmumbai, and trumpabudhabi were confusingly similar to the trademark TRUMP), <u>aff'd sub nom. Yung v. Trump</u>, 648 F. App'x 24 (2d Cir. 2016); <u>K.S.R. X-Ray Supplies, Inc. v. Se. X-Ray, Inc.</u>, No. 09-81454-CIV, 2010 WL 4317026, at *5 (S.D. Fla. Oct. 25, 2010) (domain name KSRXRAY was identical or confusingly similar to the trademark KSRX–RAY); <u>Venetian Casino Resort</u>, 380 F. Supp. 2d at 743 (domain names VenetianGoldCasino, VenetianGold, VenecianGold, VeniceGoldCasino, and VenicianGold were confusingly similar to the trademarks VENETIAN, THE VENETIAN, and VENETIAN RESORT HOTEL CASINO); <u>Omega S.A.</u>, 228 F. Supp. 2d at 126–27 (domain names OMEGAWATCH and OMEGATIME were confusingly similar to trademarks Omega and O); <u>see also</u> <u>DaimlerChrysler v. The Net Inc.</u>, 388 F.3d 201, 205–06 (6th Cir. 2004) (noting district court's summary judgment conclusion, which was not challenged on appeal, that domain name foradodge was confusingly similar to the trademark DODGE); <u>Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco</u>, 192

21

F. Supp. 2d 467, 491–92 (E.D. Va. 2002) (granting summary judgment to holder of trademark "Casino de Monte Carlo" based on ACPA defendants' registration of 43 domain names such as sexycasinomontecarlo, casinomontecarloonline, and e-casinomontecarlo, without expressly discussing the confusing similarity element of the ACPA claim), aff'd on other grounds sub nom. Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359 (4th Cir. 2003).

Boigris's domain names are confusingly similar in sight, sound, and meaning to EWC's protected trademark, and no reasonable juror could conclude otherwise. Accordingly, we **AFFIRM**.[7]

---

[7] Additionally, we **DENY** EWC's Federal Rule of Appellate Procedure 38 Motion for Damages and Double Costs.

NEWSOM, Circuit Judge, dissenting:

The Court holds that Boigris's domain names and EWC's mark are confusingly similar in sight, sound, and meaning—and indeed, and more to the point, that no reasonable juror could conclude otherwise. I disagree—the domain names and the mark contain enough differences in sight, sound, and meaning that a reasonable juror could conclude that they aren't confusingly similar. Accordingly, I respectfully dissent.

**I**

**A**

This appeal arises under the Anticybersquatting Consumer Protection Act, which provides, in relevant part, that "[a] person shall be liable in a civil action by the owner of a mark" if he "registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d). And importantly, the appeal arises from a district court's order granting summary judgment in favor of a mark owner, EWC, on its claim against a domain-name registrant, Boigris. Summary judgment is appropriate, of course, only when, viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party—here, Boigris—no reasonable juror could find in his favor. *See* Fed. R. Civ. P. 56; *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496

(11th Cir. 1996). This appeal thus presents a straightforward question: Could a reasonable juror conclude, as Boigris contends, that his domain names "europawaxcenter" and "euwaxcenter" *aren't* confusingly similar to EWC's mark "europeanwaxcenter"?

This Court has yet to describe the metes and bounds of the phrase "confusingly similar" as used in § 1125(d). But as the majority explains, other courts and commentators have generally looked to whether the mark and the domain name are "so alike in sight, sound, or meaning that they could be confused." 97 Am. Jur. Proof of Facts 3d 1 (2007). I agree with the majority that "[s]ight, sound, and meaning are tools courts . . . have used to compare the domain name and the mark," rather than "independent statutory elements necessary to prove an ACPA claim." Maj. Op. at 17. As I'll explain, though, the majority has wielded those tools improperly—and in ways that can't be reconciled with summary-judgment law and practice.

**B**

Like the majority, I will consider each of the critical factors—sight, sound, and meaning—in turn. Unlike the majority, I will explain why, in each case, a reasonable juror could conclude that Boigris's domain names and EWC's mark aren't confusingly similar.

24

## 1

As an initial matter, a reasonable juror could conclude that Boigris's domain names aren't confusingly similar in sight to EWC's mark. To be sure, the domain names "europawaxcenter" and "euwaxcenter" share the same general arrangement of characters and differ from EWC's mark only by two and six letters, respectively. But even small differences in character count and arrangement can meaningfully affect a word's appearance—think, for instance, about QUIT vs. SUIT or SEQUEL vs. SEXUAL. *See also Nat'l Distillers & Chem. Corp. v. William Grant & Sons, Inc.*, 505 F.2d 719, 721 (C.C.P.A. 1974) ("We are constrained to disagree with the board's view that DUET and DUVET 'are substantially similar in both sound and appearance.'"). Importantly, the question here, given the case's procedural posture, isn't whether *we* think that the domain names and mark *are* confusingly similar in sight, but rather whether *a reasonable juror* could conclude, to the contrary, that they *aren't* confusingly similar in sight. I think that a reasonable juror could observe the differences in sight—though small—between Boigris's domain names and EWC's mark and find them insufficiently similar to engender confusion.

## 2

The same is true—perhaps even more so—with respect to sound. The domain name "europawaxcenter" and the mark "europeanwaxcenter" possess

notable differences in rhythm, emphasis, and intonation.  "Europa" (ū·rō′på) has three syllables and places emphasis on the second; "European" (ū′rō·pē′ăn), by contrast, has four syllables and places emphasis on the third.  *See Europa* and *European*, Webster's Second New International Dictionary 882 (1944); *see also* 87 C.J.S. Trademarks, Etc. § 117 ("Courts measure the sound and auditory impressions of a mark by examining the number of words and syllables employed and the different, or similar, uses of those words and syllables.").  And "euwaxcenter" and "europeanwaxcenter" aren't even close on the sound score— notably, "eu" has either one or two syllables, as compared to four for "European." *Eu*, Webster's Second, *supra*, at 879; *EU*, n., Oxford English Dictionary, https://www.oed.com/view/Entry/60698491 (last visited July 26, 2021).  It seems to me that a juror could reasonably distinguish Boigris's domain names and EWC's mark on the basis of sound alone.

**3**

Most of all, though, Boigris's domain names and EWS's mark differ in meaning.  The majority asserts that "the domain names and the mark all impart essentially the same meaning: waxing services that are European or associated with Europe."  Maj. Op. at 12.  But a reasonable juror could surely conclude otherwise.  After all, dictionaries define "Europa" to mean, alternatively, either (1) a figure in Greek mythology and (2) a satellite moon of the planet Jupiter.  *See Europa*,

26

Webster's Second, *supra*, at 882 (defining Europa as "[a] daughter of the Phoenician king" as well as "Jupiter's satellite"); *Europa*, n., Oxford English Dictionary, https://www.oed.com/view/Entry/233638 (defining Europa as "[t]he smallest of the four Galilean satellites of Jupiter"). Conspicuously, neither of these standard definitions of "Europa" refers to the continent of Europe—at all.

So far as I can tell, the term "euwaxcenter" possesses an indeterminate meaning. As the majority emphasizes, domain names use only lowercase letters. Maj. Op. at 10–11. Accordingly, the letters "eu" in "euwaxcenter" may presumably take on the meaning those letters have either when rendered in lowercase or when capitalized. To be sure, as the majority says, "EU"—all caps—signifies "an economic and political association of certain European countries," *EU*, Oxford English Dictionary, *supra*. But just as surely, dictionaries define "eu" in several other ways. "Eu," for instance, may refer to the chemical element europium. *Eu*, Webster's Third International Dictionary 782 (1961). "Eu" may also refer to the Greek-origin prefix meaning "well," *id.*, used in English words such as "euphoria," which refers to "a feeling of well-being or elation." *Euphoria*, Webster's Third, *supra*, at 784.

I recognize, of course, that we can't view either "europa" or "eu" in isolation. The fact that, as in EWC's mark, they precede the root "waxcenter" isn't irrelevant. But the majority infers that the root "waxcenter" should be afforded

27

*significant* interpretive weight—so much weight, in fact, that all other possible meanings of "europa" and "eu," *i.e.*, those that don't pertain to the continent of Europe, are simply inapplicable. *See* Maj. Op. at 12–15. Rule 56 forbids us to make such inferences in EWC's favor. *See Tesoriero*, 965 F.3d at 1177 (noting that we view "the evidence and all reasonable inferences drawn from it in the light most favorable to the *nonmoving party*" (emphasis added)).

## C

I don't mean to suggest that *any* difference in sight, sound, and meaning—however negligible—necessarily precludes summary judgment for the trademark owner and requires a trial. After all, § 1125(d)'s language—"identical *or* confusingly similar"—implies that "confusingly similar" requires something less than identity in sight, sound, and meaning. *See Johnson v. White*, 989 F.3d 913, 917 (11th Cir. 2021) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately." (quotation marks omitted)). And, in the closely related Lanham Act context, "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination

whether there is a likelihood of confusion[.]" *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246 (2d Cir. 1983).

Our own Lanham Act caselaw involving likelihood of confusion sheds light on those outer limits. We have repeatedly stated that "likelihood of confusion generally is a question of fact." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 941 (11th Cir. 2010); *Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000); *see also Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 839 (11th Cir. 1983). Even so, we have decided likelihood of confusion as a matter of law in some instances, such as when "the plaintiff's proof . . . [is] so strong that any finding other than one of likely confusion would be clearly erroneous." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir. 1984). In *Savannah College of Art & Design, Inc. v. Sportswear, Inc.*, we affirmed the grant of summary judgment in favor of a trademark owner, noting that the alleged infringer had used a graphic bumblebee mark that was "materially indistinguishable" from the trademark. 983 F.3d 1273, 1288 (11th Cir. 2020). So too, in *Alliance Metals*, we affirmed the grant of summary judgment on the ground that there was a likelihood of confusion between the marks "Hinely Aluminum, Inc." and "Hinely Industries, Inc." 22 F.3d at 908. Conversely, in *Welding Services, Inc. v. Forman*, we held that the "[o]verwhelming visual dissimilarity" of two logos—which differed, among other

29

ways, by a single letter—defeated an infringement claim at summary judgment. 509 F.3d 1351, 1355 (11th Cir. 2007). These cases all suggest that a court's role in determining likelihood of confusion is a limited one—reserved for instances of pretty extraordinary similarity or dissimilarity.

The similarity between Boigris's domain names and EWC's mark, at the very least, isn't extraordinary. The domain names and the mark aren't "materially indistinguishable," they don't share an identical proper name, and they don't have a visual similarity that can credibly be described as "overwhelming." On the contrary, Boigris's domain names differ from EWC's mark in sight and sound, and each domain name possesses a broad range of possible meanings that may or may not match up with EWC's mark. Although our likelihood-of-confusion caselaw doesn't precisely delineate when similarity may be decided as a matter of law, it sets a threshold for similarity that EWC hasn't satisfied.

## II

In sum, Boigris's domain names and EWC's mark differ enough in sight, sound, and meaning that a reasonable juror could conclude that they aren't confusingly similar. Accordingly, I would reverse and remand. For these reasons, I respectfully dissent.