**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-10933

————————————————

TIFFANY WINGO,
    as Administrator of the Estate of Kevil Wingo, Sr.,
KIEARA WINGO,
    as surviving child of Kevil Wingo, Sr.,
ERIKA WINGO,
    as Surviving Child of Kevin Wingo, Sr.,
ESQ. TERI FIELDS,
    Conservator of Kevil Wingo, Jr., Surviving
    Minor Child of Kevil Wingo, Sr.,

*Plaintiffs-Appellants,*

ANGEL CALLOWAY,
    as mother and next friend of Erika Wingo,
    surviving minor child of Kevil Wingo, Sr., et al.,

*Plaintiffs,*

*versus*

WELLSTAR HEALTH SYSTEM, INC., et al.,

*Defendants,*

MAJOR BRANSON HARRIS,
  individually,
LIEUTENANT CHARLES GORDON,
  individually,
DEPUTY PAUL WILKERSON,
  individually,
DEPUTY LYNDA MARSHALL,
  individually,
JOHN DOES 1 - 10,
  individually and in their capacity as employees of
  Cobb County Sheriff's Office, et al.,

                                        *Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-03662-VMC

————————————————

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

The main question in this appeal is whether nonmedical jail officers were deliberately indifferent to a detainee's serious medical condition when they followed the advice of the jail's medical staff. Kevil Wingo was a pretrial detainee in the Cobb County Adult Detention Center when he died from a perforated ulcer. He was under the care of nurses at the center when he died, and those nurses had misdiagnosed him as suffering from drug withdrawal or "detox." His estate sued the Center's sheriff's deputies for deliberate indifference. We hold that a nonmedical jail officer cannot be

found liable for deliberate indifference when he or she reasonably relies on the advice or opinion of a medical professional. Because the sheriff's deputies reasonably relied on the nurses' diagnosis, we conclude that they were not deliberately indifferent. The district court also correctly granted summary judgment to Deputy Wilkerson because the plaintiff's medical expert could not say with any degree of medical certainty that he caused Wingo's death. As a result, we affirm.

## I.

In September 2019, Kevil Wingo was arrested in Cobb County for possessing 0.2 grams of cocaine. After his arrest, he was booked as a pretrial detainee at the Cobb County Adult Detention Center.

A few days after entering detention, Wingo began to complain of abdominal pain and sweating. In response to these complaints, Deputy Quinton Appleby took Wingo to the detention center's infirmary. En route to the infirmary, Wingo told Deputy Appleby that he had an ulcer, which Appleby relayed to the nursing staff.

Nurse Yvette Burton admitted Wingo to the infirmary at 12:35 a.m. that night. In the infirmary, medical staff hired through WellStar Health Systems, Inc., including Nurse Burton, were responsible for overseeing operations. Sheriff's deputies, however, were responsible for security. Those deputies were trained not to make medical decisions but instead to defer to the medical staff.

When Wingo was admitted, he was complaining of nausea, vomiting, and abdominal discomfort. He was also heard pleading with God, saying that he would never touch drugs again should he survive.

Based on these signs and symptoms, Nurse Burton believed Wingo to be detoxing or suffering from withdrawals. Indeed, at the time, Wingo was in the middle of a mandatory 5-day period of receiving "withdrawal checks" for opiates, which further confirmed her suspicion that his symptoms were a result of detoxing. Her experience as a nurse only strengthened this belief. After all, detoxing afflicts as many as 40 percent of the inmates in the infirmary. According to Nurse Shanna Griffith, another nurse on the night shift, the medical staff took Wingo's vitals and then admitted him "so he could stay overnight . . . [and] see the doctor in the morning." Doc. 200-6 at 28.

Over the course of that night, Deputy Britton McPhee, a Sheriff's Deputy serving in the infirmary, watched Wingo. Deputy McPhee observed Wingo being "very loud" from the time he entered the infirmary. This disruption continued throughout the night, causing his cell mates to protest that they could not sleep. Continuing to complain of his symptoms, Wingo repeatedly asked Deputy McPhee to send him to the hospital. In accordance with his training, Deputy McPhee replied that this decision would be up to the medical staff. Displeased with this response, Wingo replied: "just shut . . . up and do what I'm telling you to do." Doc 191-3 at 174.

At 6:00 a.m., Deputy Lynda Marshall relieved Deputy McPhee. Deputy McPhee informed Deputy Marshall that Wingo had been generally disruptive, "hollering," and demanding to go to the hospital. He also told her that, according to the nurses, Wingo was detoxing. Deputy Marshall, who had served in the Sheriff's Office for over 27 years, had frequently seen individuals detoxing during pretrial detention. Based on this experience, and judging from Wingo's symptoms, Deputy Marshall agreed with the nurses' assessment.

Nurse Annaleen Visser, who took over from Nurse Burton during the day shift, also believed that Wingo was detoxing. Wingo's frequent demands to go to the hospital did nothing to change her mind. In her experience, detoxing inmates always wish to go to the hospital in hopes of a better bed, better meals, more privacy, and opiates. In Nurse Visser's mind, inmates will "do anything to go to the ER." Doc. 200-5 at 88. Because she was so sure that Wingo was detoxing, she declined to do a physical assessment of him, preferring to wait—in accordance with detoxing protocols—for him to be "calm."

Throughout the early morning, Deputy Marshall observed Wingo continuing to yell that he needed to go to the hospital. Wingo also told Deputy Marshall that he could not breathe. In response, she told him that "if you are talking to me, you are breathing," but she also asked him for more details. Doc. 191-4 at 138. He reiterated that he could not breathe and that he needed to go to the hospital. Deputy Marshall relayed these complaints to the nurses,

who told her that Wingo was "just trying to go to the hospital, he was detoxing, drug seeking, [and] that he was okay." *Id.*

By this time, Wingo's repeated yelling and disruption had become a source of frustration to Wingo's fellow inmates. The frustration eventually reached a breaking point, and Deputy Marshall heard that Wingo's inmates were planning to fight him in his cell. She went to retrieve him. But when she opened the door, Wingo fell to the floor and again asked to go to the hospital. She informed the nurses, who did nothing in response. Then, fearing that Wingo would suffer physical harm if she put him back in his cell, she called her supervisor, Lieutenant Charles Gordon, for advice.

When Lieutenant Gordon arrived at the infirmary at 7:30 a.m., he observed Wingo on the ground. Deputy Marshall informed him that Wingo had been "causing some type [of] issue with other inmates in the cell." Doc. 191-6 at 80. Lieutenant Gordon then asked Nurse Visser whether Wingo was "okay," to which she replied that he was "medically fine." *Id.* at 65, 87-90, 96. He also asked Deputy Marshall to call his superior, Major Branson Harris, to assess the situation.

Upon Major Harris's arrival, Nurse Visser told him—as she had told Lieutenant Gordon—that Wingo was simply detoxing and drug seeking. She further told him that, in her opinion, Wingo needed to be isolated in a cell by himself. Unfortunately, the only individual cell in the infirmary was already occupied. As a result, Nurse Visser recommended, and Major Harris agreed, that Wingo

should be transferred to a padded, isolated cell in the infirmary extension. There, he would be kept under close observation.

Before transferring Wingo to the extension, Major Harris asked Nurse Visser again if it would be medically appropriate to do so. She assured him that it was.

Accordingly, at 7:45 a.m., Major Harris and Lieutenant Gordon escorted Wingo to the extension. As they walked him there, they determined that he was too unstable to walk on his own and placed him in a wheelchair. Lieutenant Gordon asked the nursing staff why Wingo was so unbalanced. The nurses said it was simply a symptom of detoxing. Shortly after 7:45, Major Harris and Lieutenant Gordon left Wingo in a padded cell.

Deputy Paul Wilkerson, who worked in the infirmary, took over responsibility for observing Wingo. Because Wingo was supposed to be under close observation in the infirmary extension, it was part of Deputy Wilkerson's duties to check in on him during security rounds every 12 minutes. In part, this was to ensure that Wingo was still alive. During these security rounds, Deputy Wilkerson was required to look in each cell rather than just rely on the cell's camera feed.

Deputy Wilkerson admits that he did not look in Wingo's cell during each security round as required. But because he saw Wingo change positions a few times through the camera feed, he believed Wingo to be alive and well. And when Major Harris and Deputy Wilkerson did a security check together at 8:22 a.m., both believed that they saw Wingo's chest rising and falling.

In the hour after Wingo arrived in the extension, neither Major Harris nor Deputy Wilkerson saw any cause for alarm. But, once Deputy Wilkerson opened the door at 8:49 a.m., it became clear that Wingo was in serious trouble. Wingo was so motionless that, initially, Deputy Wilkerson was concerned that Wingo was "possibly in the corner playing a game and possibly could jump up at any moment." Doc. 191-7 at 201. He was quickly disabused of this notion as he determined that Wingo was unresponsive, at which point he summoned the medical team on an emergency basis.

Shortly thereafter, Wingo was declared dead. An autopsy by the Cobb County Medical Examiner later found that Wingo died from complications of a perforated gastric ulcer with peritonitis.

Later, Wingo's daughter, Tiffany Wingo, acting on behalf of his estate, along with other members of Wingo's family, filed the complaint underlying this appeal. She initially named and served WellStar, several WellStar nurses, Major Harris, Lieutenant (now-Sergeant) Gordon, and Deputy Wilkerson as defendants. Later, she named and served Deputy Marshall. WellStar and the WellStar nurses eventually reached a settlement with Wingo and were dismissed. This settlement left the sheriff's deputies as the only defendants.

As relevant to this appeal, Tiffany Wingo brought claims against (1) all defendants under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to her father's serious medical needs, and (2) Deputy Wilkerson under state tort law, alleging that he was

negligent in failing to properly conduct security rounds according to official policy.

At the close of discovery, the defendants filed a motion for summary judgment as to all claims. They also moved to exclude the testimony of Tiffany Wingo's causation expert, Dr. Brian Myers. Dr. Myers had testified that the defendants' inaction caused Wingo's death. But in his deposition, Dr. Myers admitted that he could not say, "with any degree of medical certainty" whether Wingo could have been saved at 7:45 a.m. when he first entered the extension and came under Deputy Wilkerson's watch. Doc. 200-1 at 107. Dr. Myers explained that his causation opinion "doesn't bring into the issue of time;" to "opine on whether or not at 7:45 . . . if he would have survived at that point, I can't say . . . ." *Id.*

The district court (1) granted summary judgment on the section 1983 claims, concluding the defendants were protected by qualified immunity, and (2) granted summary judgment to Deputy Wilkerson on a state tort claim because Dr. Myers could not say with any degree of medical certainty whether Wingo would have survived if he had been treated differently at 7:45 a.m.

Tiffany Wingo appealed.

## II.

We review a grant of summary judgment *de novo*. *Boigris v. EWC P&T, LLC*, 7 F.4th 1079, 1084 (11th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks and citation omitted).

## III.

Tiffany Wingo argues that the district court erred in two respects. First, she says that, viewing the facts in the light most favorable to her, the defendants were deliberately indifferent to Wingo's medical needs and, as a result, violated his constitutional rights. This is so, she argues, even though it is undisputed that Deputy Marshall, Lieutenant Gordon, and Major Harris relied on the nurses' advice in their treatment of Wingo. Second, she says that the district court erred in its treatment of Dr. Myers's testimony. Tiffany Wingo says that her claims against Deputy Wilkerson survive summary judgment because Dr. Myers's testimony establishes that Deputy Wilkerson could have saved her father's life if he had called for emergency medical care between 7:45 and 8:45 a.m. We discuss each argument in turn below.

### A.

We will start with Tiffany Wingo's argument about deliberate indifference. Because the state has a "constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration," *Harris v. Thigpen*, 941 F.2d 1495,

1504 (11th Cir. 1991), the Fourteenth Amendment prohibits "[d]eliberate indifference to a prisoner's serious medical needs." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

To establish liability on a deliberate indifference claim, a plaintiff must demonstrate that: (1) the injured party suffered a deprivation that was objectively "sufficiently serious," and (2) the defendant acted with "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To meet the second step, the plaintiff must show that the "defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Id.*

Taking the undisputed facts in Tiffany Wingo's favor, we cannot say that Deputy Marshall, Lieutenant Gordon, or Major Harris were deliberately indifferent to Wingo's serious medical needs. Over the course of the night, the jail's medical staff assured each of these guards that Wingo's symptoms were consistent with drug withdrawal and that he was medically fine. Our caselaw recognizes that a nonmedical officer cannot be held liable for deliberate indifference if he reasonably relies on the opinion of a medical officer in his treatment of a detainee or inmate. For instance, in *Townsend v. Jefferson County*, we determined that correctional officers were not deliberately indifferent when they reasonably relied on a nurse's professional judgment that the situation was "not an emergency." 601 F.3d 1152, 1158–59 (11th Cir. 2010).

Our decision in *Townsend* is consistent with the law of other circuits. The Eighth Circuit, for example, has noted that "a prison official may rely on a medical professional's opinion if reliance on that opinion is reasonable." *Smith v. Lisenbe*, 73 F.4th 596, 601 (8th Cir. 2023) (internal quotation marks omitted). The Tenth Circuit has similarly made clear that "[p]rison officials generally may rely on the advice and course of treatment prescribed by medical personnel." *Est. of Beauford v. Mesa County*, 35 F.4th 1248, 1265 (10th Cir. 2022). The Seventh Circuit, too, has "long recognized" that "non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). The Sixth and Third Circuits also take this approach. *See Winkler v. Madison County*, 893 F.3d 877, 901 (6th Cir. 2018); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Applying that approach here, the guards were not deliberately indifferent to Wingo's serious medical condition. The record establishes that the medical staff assured security personnel that Wingo was medically stable and exhibiting symptoms consistent with detox. The nurses told Deputy Marshall, for instance, that Wingo was detoxing and that his requests for hospitalization were about seeking attention and drugs. Likewise, Nurse Visser told Lieutenant Gordon that Wingo was "fine medically," and the nursing staff told Lieutenant Gordon that Wingo was simply unbalanced due to detoxing. Finally, Nurse Visser told Major Harris that Wingo was detoxing and drug seeking. On this record, we can't say

the deputies' reliance on the nursing professionals was unreasonable.

Tiffany Wingo makes two arguments in response to this reasoning. But neither works.

First, she argues that nonmedical officers cannot rely on medical opinions when those opinions are obviously wrong even to a layman. We will assume without deciding that her statement of the law is correct. *Cf. Townsend*, 601 F.3d at 1159 ("Townsend has not presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged Townsend's condition."). Even so, we cannot say that the facts support her assertion that the nurses' diagnosis here would be obviously wrong to a layman. A perforated ulcer is hidden in the body and presents diffuse symptoms like nausea, vomiting, and abdominal discomfort. It is not the kind of ailment that a layman can easily diagnose.

Second, Tiffany Wingo argues that the guards could not reasonably rely on the nurses' opinions because the guards did not have the nurses reexamine Wingo after he began to stumble. We disagree. When Wingo was admitted to the infirmary, the nurses took his vitals and diagnosed him as detoxing. He was then set for observation overnight. Over the course of that night and into the morning, as Wingo began to show signs of distress, the guards alerted the nurses to his symptoms. Each time, the nurses assured the guards that Wingo was okay. The nurses concluded that Wingo was experiencing drug withdrawal, a condition they viewed as

14            Opinion of the Court            24-10933

uncomfortable but not life-threatening. That medical judgment later proved incorrect. Still, the record does not show that a reasonable nonmedical officer would have had a clear basis to question that assessment at the time.

### B.

We turn now to the grant of summary judgment in favor of Deputy Wilkerson. Dr. Myers's testimony formed the only basis for Tiffany Wingo's causation argument against Deputy Wilkerson. The district court entered judgment on the claims against Deputy Wilkerson because Dr. Myers was unwilling to say with any degree of medical certainty that Deputy Wilkerson's inaction caused Wingo's death. The district court concluded that, even if Dr. Myers's testimony were admissible, his testimony would be insufficient to survive summary judgment on causation.

We agree that Dr. Myers's testimony, even if admissible, does not create an issue of fact on causation with respect to Deputy Wilkerson's liability. Dr. Myers testified that, as a general matter, the chances of survivability of a ruptured ulcer decrease over time. When asked about Wingo's chances of survival when he first came under Deputy Wilkerson's watch at 7:45 a.m., Dr. Myers admitted that he could not say "with any degree of medical certainty" whether Wingo could have been saved. Doc. 200-1 at 107. Instead, Dr. Myers explained that his causation opinion "doesn't bring into the issue of time" and he could not "opine on whether or not at 7:45 . . . [Wingo] would have survived . . . ." *Id.*

The lack of meaningful causation evidence is fatal to Tiffany Wingo's state and federal claims against Deputy Wilkerson. Both the deliberate indifference and state tort law claims against Deputy Wilkerson require that a plaintiff demonstrate causation. *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (noting that a successful deliberate indifference claim requires that the plaintiff show causation); *Collins v. Athens Orthopedic Clinic, P.A.*, 837 S.E.2d 310, 312 (Ga. 2019) (explaining that a negligence claim under Georgia law contains four elements: a duty, a breach of that duty, causation, and damages). When the issue of causation presents a medical question beyond a layperson's ordinary experience, expert testimony is necessary for both kind of claims as well. *See Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) (section 1983 claim); *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) (same); *Cowart v. Widener*, 697 S.E.2d 779 (2010) (state law claim); Fed. R. Evid. 702.

Although Dr. Myers's testimony may have allowed a reasonable jury to find the nurses or other guards liable for their conduct earlier in the night, no reasonable jury could find Deputy Wilkerson liable based on this testimony. The district court did not err in granting Deputy Wilkerson summary judgment.

## IV.

The district court's grant of summary judgment is **AFFIRMED.**